UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

TODD CLARK,

                                    Plaintiff,          **COMPLAINT**

              *-against-*

CSX TRANSPORTATION, INC. and                 Civil Action No. 5:13-cv-01596
BROTHERHOOD OF RAILROAD                       (GLS-ATB)
SIGNALMEN,

                                    Defendants,

_____

Plaintiff, Todd Clark, by and through his attorneys, Hacker Murphy, LLP, as and for a

Complaint against the defendants, set forth the following:

## JURISDICTION

1.      This is an employment discrimination and civil rights violation complaint seeking

        damages, punitive damages, attorneys' fees and costs to redress the deprivation of

        plaintiff's constitutional and statutory rights by the defendants.

2.      This action is brought pursuant to 42 U.S.C. §1981; Title VII of the Civil Rights Act of

        1964 ("Title VII"); the Americans with Disabilities Act ("ADA"); the Fourth

        Amendment to the United States Constitution; 42 U.S.C. §1983; and 42 U.S.C. §1988.

3.      Jurisdiction of the Court is invoked under 28 U.S.C. §§1331 and 1343.

4.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiff's claims

        under the New York State Constitution.

## VENUE

5.      Pursuant to 28 U.S.C. §1391, venue properly lies in the United States District Court for

the Northern District of New York, as this is the district where, upon information and

belief, all the defendants reside and where the events complained of occurred.


## PARTIES

6.      Plaintiff is an individual that resides in Onondaga County, State of New York.

7.      Plaintiff is of Native American descent.

8.      Upon information and belief, Defendant CSX Transportation, Inc. (the "Company") is a

foreign corporation with its principal place of business located in Jacksonville, Florida.

9.      Upon information and belief, Defendant Brotherhood of Railroad Signalmen (the

"Union") is an unincorporated labor organization that maintains its headquarters in

Front Royal, Virginia.

10.     At all times relevant to this Complaint plaintiff was and is a member of Brotherhood of

Railroad Signalmen (Local 93).

## BACKGROUND

11.     From the beginning of his employment with the Company plaintiff has been subjected

to inappropriate racial and ethnic slurs concerning his Native American heritage.

12.     Unfortunately, the Company is not a diverse workforce and its management routinely

tolerates such racially insensitive conduct at the workplace.

13.     Plaintiff has been repeatedly subjected to a hostile work environment, disparate

treatment and discrimination based upon his race.

14.   For example, on countless occasions, co-workers and supervisors have approached plaintiff, held up their hand, and said "HOW" in a mocking manner as if they were Native American.

15.   On several other occasions plaintiff's supervisor made comments about the weather, and made jokes that plaintiff should know the weather since he was an Indian.  These comments were routinely made in front of coworkers and other supervisors.  Plaintiff complained to his supervisor and let him know that the jokes were inappropriate and offended him.

16.   In January 2013, plaintiff attended a Company Safety meeting in Maryland.

17.   At the meeting plaintiff witnessed a white Company foreman fold up a napkin and pretend to be a member of the Klu Klux Klan.  While many Company foremen in the room laughed, plaintiff told the foreman that he did not believe the behavior was funny or appropriate.  Although numerous Company foremen saw this behavior, the foreman was not disciplined in any way for the conduct.

18.   At the same meeting plaintiff was called a "god damn Indian" by another foreman.  Several Company employees heard this comment yet no disciplinary action was taken against the foreman for this harassment.

19.   Over the years plaintiff has been called a "damn Indian" or "stupid Indian" or similar condescending remark dozens of times.  Supervisors are aware of the comments but condone the behavior by refusing to take action to stop the behavior.

20.   On February 13, 2013 plaintiff was suspended from his job without pay.

21.     Plaintiff was suspended because he had an unopened case of beer in his truck. Ultimately plaintiff served a suspension of over four months, lost benefits and pay, and, was required to attend alcohol rehabilitation and counseling.

22.     Plaintiff contends that he was subjected to disparate treatment and retaliation as his punishment was disproportionate to the alleged violation.

23.     Plaintiff did not drink the beer while on duty and was not under the influence of any alcohol while on duty.

24.     Plaintiff was never notified of a Company policy or law that prohibited him from having an unopened case of beer in his locked truck during working hours or after hours.

25.     A Company supervisor illegally searched plaintiff's truck and after he saw the beer stated "I know an alcoholic when I see one."  He also stated that "You have put everybody here in danger."

26.     However, plaintiff was not under the influence of alcohol and the unopened case of beer in his truck poses no safety risks.

27.     A well-known (but untrue) stereotype of Native Americans is that they abuse alcohol.

28.     The Company supervisor improperly perceived plaintiff as an alcoholic based upon his discriminatory animus toward plaintiff.

29.     The Company supervisor then proceeded to violate plaintiff's privacy rights and rights of confidentiality guaranteed under Federal and State Law (and Company policy) when he proceeded to inform plaintiff's co-workers that plaintiff was drinking on the job while they were out to lunch.  The Company supervisor falsely told the co-workers that plaintiff kept the beer in his truck so he could have access to it and drink it while they

were at lunch.  He also asked the employees several questions concerning plaintiff's work behavior, including "how often" they have witnessed plaintiff drinking beer or under the influence while on the job.

30.   Plaintiff's coworkers unanimously confirmed that plaintiff had never drank alcohol, nor have they seen him under the influence of alcohol, while on the job.  Yet, the Company supervisor had made up his mind—he perceived plaintiff as an alcoholic, assumed he was drinking on the job, and made sure plaintiff was to be punished for the behavior.

31.   To the extent the Company claims to outlaw the "possession" of alcohol in vehicles at all times, plaintiff was certainly never informed of this policy.

32.   Further, as plaintiff explained to Company management, a large number of Company employees have legally purchased alcohol and drove around with the beer in their truck, and that plaintiff had never heard of anyone getting in trouble for this before.

33.   In addition, there are several other alcohol policies that are routinely violated by Company employees, yet the Company ignores these violations.

34.   Several days after being suspended, plaintiff was told that he violated Federal Law and Company policy because of his "possession" of alcohol while at work.

35.   First, plaintiff did not "possess" alcohol at work as the unopened case of beer was located in a locked truck and was nowhere near him.  Certainly plaintiff did not have beer in his hand, in his pocket, or anywhere else in his possession.

36.   Further, as stated above, the enforcement of this "alleged" policy to plaintiff (and only plaintiff) shows that he had been singled out.

37.   Plaintiff informed the Company that he did not believe that he violated any work rule, that he felt singled out, and that he was offended and did not appreciate the way his

supervisor had treated him by calling him an alcoholic and disclosing the perceived condition to plaintiff's coworkers.  Plaintiff informed the Company that he had hired a lawyer to protect his rights.

38.     After plaintiff expressed his concerns and after he advised the Company and his Union that he had hired an attorney, he was told by the Union that the only way to save his job was to "admit" guilt and enter into an alcohol rehabilitation program.

39.     The Union official explained that the only way for plaintiff to keep his job was to tell the Company that he had been drinking on the job (a lie) and that he wanted to seek treatment.  The Union official stated that if plaintiff agreed to treatment he would be suspended without pay for 6 months, and be on probation for 5 years.

40.     Plaintiff's disciplinary hearing was delayed without explanation and with great prejudice to plaintiff.

41.     In the days, weeks and months following this ordeal plaintiff was repeatedly contacted by coworkers who had heard about the incident.

42.     Shortly after the incident plaintiff was contacted by an Employee Assistance Professional employed by the Company.

43.     Immediately upon answering the phone the EAP Counselor started asking plaintiff why he had not picked up her prior calls.

44.     The EAP counselor asked if plaintiff was drinking and stated that the reason plaintiff had not answered her calls was because he was abusing alcohol.  The EAP counselor then asked plaintiff how many DWIs plaintiff has had and when he said none she said she did not believe him.

45.    The EAP counselor then told plaintiff that he should admit that he was an alcoholic and was under the influence at work.  She said this was the only way to save plaintiff's job.

46.    When plaintiff explained that he was not an alcoholic and had never been under the influence of alcohol at work, she said "come on" everyone knows that "signalmen are a bunch of drunks."

47.    Plaintiff told the EAP counselor that he was not an alcoholic and she said she disagreed, that she believed plaintiff was an alcoholic who needed treatment in order to save his job.

48.    Upon information and belief the EAP counselor informed Union and Company officials about their conversation.

49.    Company Policy (and Federal and State Law) require strict confidentiality when a serious personal and private matter such as suspected alcoholism is discussed.

50.    Upon information and belief, the Company and the Union openly discussed the matter and decided and agreed upon plaintiff's punishment before affording plaintiff the opportunity to defend against the charges at a hearing.

51.    The Company and the Union threatened, bullied and coerced plaintiff into lying about the situation in order to save his job.

52.    The Union and the Company informed plaintiff that he would lose his job unless he was willing to attend alcohol rehabilitation counseling, serve a six month suspension from work, and be put on probation for 5 years.

53.    Plaintiff denies that he was drinking on the job or that his actions put his crew in danger, but to the extent the Company supervisor or any other coworker felt that such a situation was present, then the matter should have been governed by the "CSX

Operation RedBlock Mark-off Procedures" which would have resulted in Mr. Clark

facing no discipline.

54.     The relevant policy states that "No discipline will be administered and no records will

be kept. Once the incident is over and the employee is off duty, notify a RedBlock team

member of the incident so that help can be offered confidentially to the employee."

55.     The RedBlock procedure is run by the Union and supported by the Company.

Following this procedure, it is very clear that Mr. Clark should not have faced any

discipline and should not have been immediately referred to alcohol and rehabilitation

counseling.

56.     Further, if the Company supervisor had been properly trained, he should have refrained

from speaking about the issue with any of Mr. Clark's coworkers.

57.     The RedBlock procedure states:

> First time - Team Captain contacts employee, discusses with him/her facts of
> markoff and offers whatever assistance is necessary. Reminds employee of his/her
> working responsibility.

> Second time - Team Captain contacts employee, discusses facts of the mark-off,
> educates employee on guidelines for Operation RedBlock program, and their
> work responsibility. If mark-off happens again, employee could be referred to the
> EAP Counselor in accordance with the Co-Worker Bypass Agreement. The
> employees' Local Chairman will be consulted.

> Third time - Team Captain contacts employee and discusses the mark-off. Team
> Captain will counsel with the employees' Local Chairman, ORB System
> Coordinator and General Chairman. If all agree, employee will be instructed to
> contact company EAP Counselor within 5 days as per the Co-Worker Bypass
> Agreement. The ORB Coordinator will then contact local management as per Co-
> Worker Bypass Agreement.

58.     Eventually a disciplinary hearing was scheduled for April 25, 2013.  Mr. Clark

requested that his private counsel be allowed to attend the Hearing but both Company

and the Union refused, despite the clear conflict of interest of union representation, as

Mr. Clark had already filed his Complaint with the New York State Division of Human Rights against the Union.

59. The Union did nothing to prepare Mr. Clark for the Hearing and told Mr. Clark (again) that there was no defense to the charge so he would be fired. Under a tremendous amount of financial stress, and, according to the Union, having no defense and facing certain dismissal, Mr. Clark agreed to attend EAP counseling.

60. The Union refused to fight for Mr. Clark when there were quite obviously some very good arguments to make: (a) As set forth above, Mr. Clark has never received training or any other warning to suggest that storage of an unopened case of beer in a truck would violate company policy or federal law; (b) there was clear evidence that the Company does not consistently apply its rules and alcohol policies; (c) Redblock should have been used and the entire formal proceedings avoided; (d) even if the charges could be proven, the maximum penalty should have been a 15 day suspension from work. See NATIONAL RAILROAD ADJUSTMENT BOARD Award Number 26261. This decision is particularly relevant because the Adjustment Board found that the credible evidence PROVED possession of alcohol (actually on the employee's person, not an unopened pack of beer in a truck) yet the Adjustment Board reduced the penalty of 30 day suspension as arbitrary and capricious. Rather, a 15 day suspension was found to be the maximum allowable penalty. This decision likewise does not reference any requirement that the accused go through 6 months of counseling nor does the decision mandate 5 years of probation.

61. The Union also refused to advocate for Mr. Clark with regard to the illegal search of his vehicle.

62.    Clearly there were arguments the Union could have made but intentionally chose to leave Mr. Clark stranded without any representation and without any preparation for the Hearing.  This is clear evidence of disparate treatment and retaliation by the Union.

63.    Further, the Company and the Union discussed plaintiff's incident very publicly and have caused the situation to become part of the Company "rumor mill" and are therefore responsible for the extreme humiliation, embarrassment, stigma and ridicule that plaintiff has sustained.

64.    Throughout the disciplinary proceeding Union and the Company continually took the position that they had no discretion because Federal law prevents them from disregarding an alcohol violation (assuming for argument sake that alcohol stored in a vehicle is tantamount to possession).

65.    Plaintiff had complained and stated that he felt that the "hard line" approach was taken because Mr. Clark complained about the manner in which he had been treated, and therefore the Company and the Union decided to retaliate against him.

66.    The Redblock procedure, outlined above, supports Mr. Clark as it shows that Company and the Union (a) were not forced to take Mr. Clark out of service for over 4 months; and, (b) were not required to refer him to EAP.  In fact, the requirement of mandatory EAP referral and use of the Co-Worker Bypass only kicked in after the third violation in a twelve month period.

67.    Therefore, although Company and the Union have repeatedly contended that their actions were supported and mandated by Federal law, this "alleged" legitimate reason for their actions is clearly pretext.

68.     Also, the fact that Mr. Clark's Union did nothing to defend plaintiff and repeatedly
        attempted to coerce him into accepting unwarranted discipline and treatment shows that
        they were not fairly representing Mr. Clark as they should have demanded that the
        Redblock procedures be followed.

69.     Mr. Clark was taken out of service for having an unopened 30 pack of beer in his truck.
        Mr. Clark complained to the Union and Company that it was not fair that he was taken
        out of service.  Mr. Clark explained that he was not under the influence of alcohol at
        work, did not have alcohol in his possession, and was not tested (as company policy
        and federal regulations require if there is suspicion of alcohol use on the job).  Mr.
        Clark also explained that a large number of Company employees have legally
        purchased alcohol and drove around with the beer in the truck.  Mr. Clark stated that he
        had hired an attorney to protect his rights as he felt he was being singled out, and,
        because numerous Company officials had called him a "drunk" or "alcoholic."  Mr.
        Clark also expressed concern that the Company failed to keep this matter confidential,
        as Company policy and ADA laws require.

70.     After Mr. Clark complained that he was being singled out and that he did not appreciate
        being treated like a "drunk" he was told by the Union that the only way to save his job
        was to admit that he was drinking and to enter into an alcohol rehabilitation program.

71.     This was Mr. Clark's first (alleged) violation and he was not given the "three strikes"
        required by the Redblock procedures.   Instead, he was taken out of service and referred
        right to EAP.  This is clear evidence of disparate treatment and retaliation.

72.     Further, even if this was Mr. Clark's third strike and he was required to go to EAP and
        use the Bypass Agreement, the Union and Company failed to protect Mr. Clark's rights

under that Agreement as well since they waited nearly 4 months to hold the hearing.

Even though the relevant rule requires a hearing within 10 days.  The obvious intent of

this rule is to minimize the financial impact to the accused.

73.    The Company supervisor told Mr. Clark that "he knows an alcoholic when he sees one"

and that Clark's behavior has "put everyone's safety at risk."  Further, when Mr. Clark

went to EAP, his counselor accused him of drinking and said she did not believe him

when he denied it, because "all signalmen drink."  Therefore, it is clear that Company

regarded Mr. Clark as an alcoholic and believed that the disability impaired Clark's

ability to perform his job.

74.    The evidence of inconsistent enforcement of a policy concerning alcohol use (e.g., not

enforcing the policy uniformly) proves discrimination against an employee such as Mr.

Clark who has been "regarded as" being an alcoholic.

75.    Mr. Clark has suffered great anxiety and emotional distress.

76.    Mr. Clark has suffered economic loss.

77.    Since returning to work plaintiff has suffered additional retaliation and disparate

treatment in the form of adverse working conditions; increased scrutiny and oversight;

targeted drug and alcohol testing; loss of benefits; and, lack of support in his position.

78.    The Company is vicariously liable for the actions of its supervisors.  The Company is

also liable for the actions of its supervisors and employees because it condoned,

accepted and approved the actions of its supervisors and employees by: (a) failing to

provide an effective complaint procedure; (b) by failing to properly train and educate its

supervisors and employees concerning discrimination, harassment and retaliation; (c)

by refusing to undertake a prompt and thorough investigation; (d) by failing to take

effective remedial and corrective action; (e) by treating plaintiff as though he was the one that did something wrong; (f) by refusing to apologize to plaintiff or otherwise send a message that the offensive behavior would not be tolerated and is unacceptable in the workplace; and, (g) by retaliating against plaintiff.

79.     The Union is liable for the discriminatory practices by the Company because the Union acquiesced in the discriminatory practices and failed to take appropriate action against such practices.

80.     The Union is also vicariously liable for the acts of its leadership who violated plaintiff's privacy rights and retaliated against plaintiff after he made protected complaints about discrimination.

81.     Plaintiff preserved his Title VII and ADA causes of action by timely filing a Summons with Notice within 90 days of the EEOC issuing a Right to Sue Notice.

## FIRST CAUSE OF ACTION
(Title VII discrimination, hostile work environment and retaliation)
)

82.     Plaintiff repeats and incorporates by reference all allegations in all preceding paragraphs.

83.     By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of race, by allowing and condoning a hostile work environment to be created, and by refusing to take prompt remedial action to stop the harassment.

84.     Plaintiff has been subjected to Retaliation for speaking out against the manner in which he was treated in the workplace.

85.     Based upon the foregoing, defendants are hereby charged with violation of the Title VII of the Civil Rights Act of 1964.

86.     Plaintiff respectfully requests an award of damages to compensate him for the emotional harm, physical injury, embarrassment, and humiliation he has suffered and will continue to suffer.

87.     Plaintiff also respectfully requests an award of damages to compensate him for compensation and benefits he has lost and will continue to lose.

88.     Plaintiff requests an award of attorneys' fees, costs and disbursements.

89.     Finally, plaintiff requests an award of punitive damages because the discrimination, harassment, and retaliation outlined above were malicious and/or reckless acts.

## SECOND CAUSE OF ACTION
(42 U.S.C. 1981 against all defendants)

90.     Plaintiff repeats and incorporates by reference all allegations in all preceding paragraphs.

91.     By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of race, by allowing and condoning a hostile work environment to be created, and by refusing to take prompt remedial action to stop the harassment.

92.     Plaintiff has been subjected to Retaliation and wrongful termination for speaking out against the manner in which he was treated in the workplace.

93.     Based upon the foregoing, defendants are hereby charged with violation of 42 U.S.C. 1981.

94.     Plaintiff respectfully requests an award of damages to compensate him for the emotional harm, physical injury, embarrassment, and humiliation he has suffered and will continue to suffer.

95.     Plaintiff also respectfully requests an award of damages to compensate him for
        compensation and benefits he has lost and will continue to lose.

96.     Plaintiff requests an award of attorneys' fees, costs and disbursements.

97.     Finally, plaintiff requests an award of punitive damages because the discrimination,
        harassment, and retaliation outlined above were malicious and/or reckless acts.

### THIRD CAUSE OF ACTION
(Americans with Disabilities Act, discrimination, hostile work environment and retaliation)

98.     Plaintiff repeats and incorporates by reference all allegations in all preceding
        paragraphs.

99.     By the acts and practices described above, defendants discriminated against plaintiff in
        the terms and conditions of his employment on the basis of perceiving plaintiff as
        disabled; by harassing and discriminating against plaintiff because of his perceived
        disability; by violating plaintiff's confidentiality and privacy rights; by allowing and
        condoning a hostile work environment to be created; and by refusing to take prompt
        remedial action to stop the mistreatment and harassment of plaintiff.

100.    Plaintiff has been subjected to Retaliation for speaking out against the manner in which
        he was treated in the workplace.

101.    Based upon the foregoing, defendants are hereby charged with violation of Americans
        with Disabilities Act, as amended.

102.    Plaintiff respectfully requests an award of damages to compensate him for the
        emotional harm, physical injury, embarrassment, and humiliation he has suffered and
        will continue to suffer.

103.    Plaintiff also respectfully requests an award of damages to compensate him for

compensation and benefits he has lost and will continue to lose.

104.    Plaintiff requests an award of attorneys' fees, costs and disbursements.

105.    Finally, plaintiff requests an award of punitive damages because the discrimination,

harassment, and retaliation outlined above were malicious and/or reckless acts.

## FOURTH CAUSE OF ACTION
(Fourth Amendment to U.S. Constitution and 42 U.S.C. Section 1983)

106.    Plaintiff repeats and incorporates by reference all allegations in all preceding

paragraphs.

107.    Plaintiff's vehicle was illegally searched by the Company supervisor.  On the day in

question, the very first thing the Company supervisor did was to go directly to Mr.

Clark's truck and start searching the vehicle; (2) never before had a safety audit

included a search of a vehicle; (3) The Company supervisor passed at least 4 other

vehicles as he headed toward Mr. Clark's truck-he did not search any of those vehicles

before heading to Mr. Clark's truck; (4) After searching Mr. Clark's truck, the

supervisor did not search any other vehicles; (5) Mr. Clark had never had his truck

searched before and had an expectation of privacy that the truck would not be searched.

108.    Notably, Mr. Clark had this truck for two years.   The truck was leased by the Company

but for all intents and purposes it was Mr. Clark's truck.  He drove it to and from work

every day, to and from motels that he lived in during the week, and, to and from the

jobsite.  Mr. Clark was the only person ever to use the truck and routinely kept personal

items in the truck as he considered it his truck.  The Company paid for the lease but the

truck was Mr. Clark's responsibility to maintain.  Mr. Clark was the only one to bring

the truck to the dealership when things went wrong with the truck, was the only person

to ever bring the truck for servicing, and, was the only person to put gas in the truck.

The truck did not have a Company logo nor any other identifying marks that would

indicate that it was a Company truck.

109.     Defendant Company violated plaintiff's rights to the security and privacy of his vehicle

and his person under the Fourth Amendment (through the Fourteenth Amendment) and

42 U.S.C. Section 1983.

110.     Defendant Company acted under color of law.

111.     Plaintiff respectfully requests an award of damages to compensate him for the

emotional harm, physical injury, embarrassment, and humiliation he has suffered and

will continue to suffer.

112.     Plaintiff also respectfully requests an award of damages to compensate him for

compensation and benefits he has lost and will continue to lose.

113.     Plaintiff requests an award of attorneys' fees, costs and disbursements.

114.     Finally, plaintiff requests an award of punitive damages because the constitutional

violation outlined above were malicious and/or reckless acts.

### FIFTH CAUSE OF ACTION
(New York State Constitution)

115.     Plaintiff repeats and incorporates by reference all allegations in all preceding

paragraphs.

116.     The New York State Constitution (Section 12) protects individuals from illegal

searches and seizures.

117.     Defendant Company violated plaintiff's rights to the security and privacy of his vehicle.

118.    Defendant Company acted under color of law.

119.    Plaintiff respectfully requests an award of damages to compensate him for the emotional harm, physical injury, embarrassment, and humiliation he has suffered and will continue to suffer.

120.    Plaintiff also respectfully requests an award of damages to compensate him for compensation and benefits he has lost and will continue to lose.

121.    Plaintiff requests an award of attorneys' fees, costs and disbursements.

122.    Finally, plaintiff requests an award of punitive damages because the constitutional violation outlined above were malicious and/or reckless acts.


WHEREFORE, plaintiff demands judgment against the defendants as set forth above, together with the costs and disbursements of this action, and for such other and further relief as to the Court seems just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated:  January 14, 2014

HACKER MURPHY, LLP

Ryan M. Finn, Esq.
NDNY Bar Roll Number:  513670
rfinn@hackermurphy.com
7 Airport Park Blvd.
Latham, NY 12110
518.213.0115