# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

**TODD CLARK,**

                              **Plaintiff,**                    **5:13-cv-1596
                                                                (GLS/ATB)**

            **v.**

**CSX TRANSPORTATION, INC. et
al.,**

                              **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Hacker, Murphy Law Firm                       RYAN M. FINN, ESQ.
7 Airport Park Boulevard
Latham, NY 12110-0104


**FOR THE DEFENDANTS:**
*CSX Transportation, Inc.*
Nixon, Peabody Law Firm                       SUSAN C. RONEY, ESQ.
Key Towers at Fountain Plaza
40 Fountain Plaza
Suite 500
Buffalo, NY 14202


*Brotherhood of Railroad Signalmen*
Office of William L. Phillips                 WILLIAM L. PHILLIPS, ESQ.
33 N. LaSalle Street, #2100
Chicago, IL 60602

**Gary L. Sharpe
Chief Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Todd Clark commenced this action against defendants CSX Transportation, Inc. and Brotherhood of Railroad Signalmen (BRS), alleging discrimination based on race and disability pursuant to Title VII of the Civil Rights Act of 1964,[1] the Americans with Disabilities Act,[2] and 42 U.S.C. § 1981.[3] (*See generally* Compl., Dkt. No. 7.) CSX filed an answer to the complaint, (Dkt. No. 11), and BRS filed a pre-answer motion, pursuant to Fed. R. Civ. P. 12(b)(6), seeking dismissal of all of Clark's claims against it. (Dkt. No. 12.) For the reasons that follow, the motion to dismiss is denied.

## II. Background[4]

Clark, an individual of Native American descent, was, at the time relevant to this action, an employee of CSX, and a member of BRS Local

_____

[1] *See* 42 U.S.C. §§ 2000e–2000e-17.

[2] *See* 42 U.S.C. §§ 12101-12213.

[3] Clark has also asserted additional claims against CSX only, regarding an allegedly illegal search of his vehicle. (Compl. ¶¶ 106-22.) As the instant motion to dismiss has been brought by BRS alone, those claims are not at issue here.

[4] Unless otherwise noted, the facts are drawn from Clark's complaint and presented in the light most favorable to him.

93, a labor organization.  (Compl. ¶¶ 7, 8-11.)  Clark alleges that "[f]rom the beginning of his employment with [CSX, he] has been subjected to inappropriate racial and ethnic slurs concerning his Native American heritage."  (*Id.* ¶ 11.)  He has been subjected to discriminatory conduct by both coworkers and his supervisor, in the form of stereotypical and offensive jokes and comments.  (*Id.* ¶¶ 14-19.)  Many of these incidents occurred in front of other coworkers and supervisors.  (*Id.* ¶¶ 15, 17-18.)  Clark complained to his supervisor about this conduct, but the offending parties were "not disciplined in any way for the conduct," (*id.* ¶¶ 15, 17), and he alleges that his superiors "condone the behavior by refusing to take action to stop [it]," (*id.* ¶ 19).

In February 2013, a supervisor performed a search of Clark's vehicle, at which time an unopened case of beer was discovered in Clark's truck.  (*Id.* ¶¶ 20-21, 25.)  Although Clark did not drink the beer while on duty, he was accused of being an alcoholic and endangering his coworkers.  (*Id.* ¶¶ 23, 25.)  Clark was placed on suspension without pay.  (*Id.* ¶ 20.)  Several days after his suspension began, Clark was informed that his alleged possession of alcohol at work violated both federal law and CSX policies.  (*Id.* ¶ 34.)  However, identical behavior by other employees went

unaddressed by CSX management, and Clark therefore informed his employer that he had hired a lawyer because he felt "offended" and "singled out" for punishment.  (*Id.* ¶¶ 32-33, 36-37.)

Upon conveying these concerns to both his employer and the union, Clark was told by BRS that "the only way for [Clark] to keep his job was to tell [CSX] that he had been drinking on the job (a lie) and that he wanted to seek treatment."  (*Id.* ¶¶ 38-39.)  Clark was thus "threatened, bullied and coerced [by BRS] into lying about the situation in order to save his job."  (*Id.* ¶ 51.)  According to Clark, CSX and BRS officials "decided and agreed upon [Clark]'s punishment before affording [him] the opportunity to defend against the charges at a hearing."  (*Id.* ¶ 50.)  A hearing was ultimately scheduled for April 25, 2013, after an unexplained delay, but at some point prior to that, Clark filed a complaint against BRS with the New York State Division of Human Rights (DHR).  (*Id.* ¶¶ 40, 58.)  BRS refused to prepare or assist Clark in anticipation of the hearing.  (*Id.* ¶¶ 59-62.)  Clark complained that he felt BRS was refusing to assist him because of his earlier complaints "about the manner in which he had been treated."  (*Id.* ¶¶ 65, 70)

During this same period, shortly after the incident at issue occurred,

Clark was contacted by an Employee Assistance Professional (EAP) counselor employed by CSX. (*Id.* ¶ 42.) According to Clark, during their phone conversation, the EAP counselor accused him of being an alcoholic, and urged him to admit that he was under the influence of alcohol at work, despite his insistence that this had never been the case. (*Id.* ¶¶ 43-47.) At one point, the counselor stated that it was common knowledge that "'signalmen are a bunch of drunks.'" (*Id.* ¶ 46.) After this conversation concluded, the counselor then "informed [BRS] and [CSX] officials about [the] conversation," (*id.* ¶ 48), who then "openly discussed the matter," (*id.* ¶ 50), "very publicly[,] caus[ing] the situation to become part of the [c]ompany 'rumor mill,'" (*id.* ¶ 63). This disclosure caused Clark "extreme humiliation, embarrassment, stigma and ridicule." (*Id.*)

Clark ultimately agreed to attend alcohol rehabilitation counseling, (*id.* ¶ 59), but alleges that his "punishment was disproportionate to the alleged violation," (*id.* ¶ 22), and that CSX alcohol policies were not uniformly enforced, to his detriment, (*id.* ¶ 74). Clark alleges that he has continued to experience "adverse working conditions[,] increased scrutiny and oversight[,] targeted drug and alcohol testing[, and] loss of benefits" since returning to work. (*Id.* ¶ 77.) In January 2014, Clark commenced this

action.  (*See generally id.*)

### III.  Standard of Review

The standard of review under Fed. R. Civ. P. 12(b)(6) is well settled

and will not be repeated here.  For a full discussion of the standard, the

court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz,*

*LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010).

### IV.  Discussion

BRS asserts in its motion that all of Clark's claims against it should

be dismissed for failure to state a claim.  (Dkt. No. 12, Attach. 1 at 4-15.)

Specifically, it argues that Clark's discrimination and retaliation claims are

"utterly implausible," (*id.* at 4-12), that BRS's acquiescence in the

discriminatory practices of CSX does not subject it to liability, (*id.* at 12-13),

and that Clark has inadequately pleaded that BRS disclosed confidential

information in violation of the ADA, (*id.* at 13-15).  In response, Clark

argues that he has properly pleaded his claims against BRS.  (Dkt. No. 16

at 4-11.)  For the reasons that follow, BRS's motion to dismiss is denied.

Under Title VII,[5] it is "an unlawful employment practice for an

---

[5] "Both the Supreme Court and Second Circuit have treated the substantive issues arising under Title VII and § 1981 identically."  *Staff v. Pall Corp.*, 233 F. Supp. 2d 516, 527 (S.D.N.Y. 2002) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989); *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998)), *aff'd* 76 F. App'x 366 (2d Cir.

employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting rules, which place upon the plaintiff the initial burden of making out a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To satisfy this initial burden, the plaintiff "'must show: (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).

Title VII further provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [that employee] has opposed any practice made an unlawful

---

2003). Specifically, as pertinent to the parties' arguments here, "[a] plaintiff's efforts to establish the [intent] element of a § 1981 claim are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII." *Jenkins v. NYC Transit Auth.*, 201 F. App'x 44, 45-46 (2d Cir. 2006).

employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001).

Discrimination by unions is also prohibited by Title VII, which makes it "an unlawful employment practice for a labor organization . . . to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(c)(1); *see Yerdon v. Henry*, 91 F.3d 370, 375 (2d Cir. 1996) (finding that a labor union could be liable under Title VII).  A Title VII claim brought against a union, however, is evaluated differently than such a claim against an employer.  To succeed on his claim, a plaintiff first must show that "the [u]nion breached its duty of fair representation to him."  *Oparji v. United Fed'n of Teachers*, 418 F. Supp. 2d 139, 147 (E.D.N.Y. 2006).  A union breaches its duty of fair representation when (1) "its

conduct toward a member . . . is arbitrary, discriminatory, or in bad faith," *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998), and (2) the alleged misconduct injures the plaintiff, *Spellacy v. Airline Pilots Assoc.-Int'l*, 156 F.3d 120, 130 (2d Cir. 1998). If a plaintiff establishes a breach of the duty of fair representation, he then "must show some indication that the union's actions were motivated by unlawful discrimination or retaliation." *Oparji*, 418 F. Supp. 2d at 146.

The analysis is virtually the same for alleged violations of the ADA. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (noting that "it is appropriate to apply the framework used in analyzing retaliation claims under Title VII in analyzing a claim of retaliation under the ADA"); *Gerena v. Local 670 Stationary Eng'rs & Bldg. Servs. Union*, No. 12-Civ-7484, 2013 WL 3486976, at *4 (S.D.N.Y. July 10, 2013). The ADA prohibits discrimination against any "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To state a prima facie case of disability discrimination under the ADA, a plaintiff must show that:

(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA;[6] (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

*Giordano v. City of N.Y.*, 274 F.3d 740, 747 (2d Cir. 2001) (quoting

*Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty.*

*Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999)).

Furthermore, the ADA has additional provisions governing the

confidentiality of disability-related information. Specifically, it requires that

employers not make inquiries of employees pertaining to their disabilities

unless the inquiries are related to the job or are consistent with a business

necessity. *See* 42 U.S.C. § 12112(d)(4). In addition, it requires that the

information revealed be kept confidential. *See id.* § 12112(d)(3)(B)

("[I]nformation obtained regarding the medical condition or history . . . is

treated as a confidential medical record.").

Here, BRS argues that "all claims of discrimination and retaliation by .

. . BRS should be dismissed for failure to state a claim." (Dkt. No. 12,

Attach. 1 at 4-12.) Its primary argument is that it has an "'alternative

_____

[6] The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

explanation' so 'obvious' as to render [Clark]'s discrimination and retaliation claims utterly implausible," namely, that Clark's suspension and subsequent return-to-work conditions were mandated by federal regulations and CSX policy. (*Id.* at 5.) Thus, the crux of BRS's argument is that it did not breach the duty of fair representation because "[i]t is utterly implausible that, by discouraging . . . Clark from testing the disciplinary and grievance and arbitration processes, . . . BRS represented him unfairly." (*Id.* at 9.) While BRS may or may not ultimately be successful in proving this assertion, the court is required, at this juncture, to accept all allegations in the complaint as true, and make all reasonable inferences in favor of the nonmoving party, Clark. *See Fowlkes v. Adamec*, 432 F.3d 90, 95 (2d Cir. 2005) (citation omitted) (in reviewing a motion to dismiss, a court "must accept the facts alleged in the complaint as true and construe all reasonable inferences in [the plaintiff's] favor"). Here, Clark alleges that BRS breached its duty of fair representation in a manner discriminatory to him, because it "threatened, bullied and coerced [him] into lying about the situation," (Compl. ¶ 51), and pressured him into attending an alcohol rehabilitation program instead of disputing the infractions of which he was accused, (*id.* ¶¶ 52, 59, 68). He further alleges that CSX was selectively

enforcing its alcohol use policies against him because of his perceived disability, (*id.* ¶ 74), and that BRS "acquiesced in . . . and failed to take appropriate action against" these allegedly discriminatory practices," (*id.* ¶ 79). While BRS argues that its representation of Clark in this matter was reasonable, it would be premature to make such a finding at this juncture, and the court finds that, at this stage, Clark has adequately pleaded causes of action for disparate treatment and retaliation.

BRS alternatively argues that all claims alleging that it allowed or condoned the discrimination and disparate treatment against Clark should be dismissed for failure to state a claim. (Dkt. No. 12, Attach. 1 at 12-13.) Specifically, citing only cases from other circuits, BRS argues that labor unions have no affirmative duty to prevent harassment in the workplace or to investigate discrimination by an employer, and instead are subject to liability "only if 'the [u]nion *itself* instigated or actively supported the discriminatory acts.'" (*Id.* (quoting *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1076-77 (8th Cir. 2005)).)

Contrary to BRS's narrow interpretation of potential union liability, district courts within the Second Circuit hold that a union "may be held liable for implicitly condoning [disparate] treatment by failing to take action

against it." *Martin v. New York State Dep't of Corr. Servs.*, 115 F. Supp. 2d 307, 315 (N.D.N.Y. 2000) (citing *Nweke v. Prudential Ins. Co. of Am.*, 25 F. Supp. 2d 203, 220 (S.D.N.Y. 1998) (holding that "a union's role in ratifying an employer's discriminatory practice could be sufficient to compel a finding of liability against it"); *see United States v. City of Buffalo*, 457 F. Supp. 612, 639 (W.D.N.Y. 1978) (holding that "[t]acit union acquiescence in an employer's discriminatory practices is sufficient to render it liable"); *United States v. Bethlehem Steel Corp.*, 312 F. Supp. 977, 990 (W.D.N.Y. 1970) ("The notice of such discriminatory practices to [the union] placed upon [it] the duty to take whatever steps were lawful to alleviate the discrimination and the effects of such discrimination upon its . . . membership."), *rev'd in part on other grounds*, 446 F.2d 652 (2d Cir. 1971)).  Further, here, Clark alleges more than mere acquiescence on the part of BRS; he alleges that the union participated in the selective enforcement of both legal regulations and company policy when it unduly delayed his disciplinary hearing and conspired with CSX to determine a punishment before any hearing took place, (Compl. ¶¶ 40, 50), disclosed confidential information regarding his medical condition, (*id.* ¶ 50), "threatened, bullied and coerced" him into lying about drinking alcohol on

the job, (*id.* ¶ 51), and refused to assist him throughout the disciplinary process, (*id.* ¶¶ 58-62), all in retaliation for speaking out against the treatment he was receiving and for filing a complaint against BRS with the DHR, (*id.* ¶¶ 58, 65).  For this reason, as well as those discussed above, at this juncture, Clark has adequately stated a claim for discrimination and retaliation against BRS.  Accordingly, the court declines to dismiss Clark's claims on this basis.

With respect to Clark's allegation that BRS representatives disclosed confidential information regarding his disability, in violation of the ADA, (Compl. ¶ 99), BRS argues that this claim should be dismissed because there are insufficient facts pleaded in the complaint to allow the court to draw an inference in Clark's favor that confidential information regarding his medical condition or history was disclosed.  (Dkt. No. 12, Attach. 1 at 13-15.)  As described below, BRS asks the court to draw inferences in its favor and dismiss this claim.  (*Id.*)

For example, BRS asserts that from Clark's "allegation that the EAP [counselor] 'informed [BRS] and [CSX] officials about their conversation,'" the court should only "infer[ ] that she told [CSX] and . . . BRS that the conversation had taken place."  (*Id.* at 14.)  Similarly, BRS asks the court to

infer from Clark's allegation that defendants "'openly discussed the matter'" that they were merely engaging in collective bargaining, and not "that they improperly disclosed protected information." (*Id.*)  While it will ultimately be Clark's burden to substantiate his allegations with record evidence support, at this stage, all allegations in the complaint are assumed to be true and all reasonable inferences are drawn in favor of the nonmoving party.  *See Fowlkes*, 432 F.3d at 95.  Under this standard, Clark has plausibly pleaded a claim under 42 U.S.C. § 12112(d)(4).  *See, e.g.*, *Desano v. Blossom S., LLC*, 553 F. Supp. 2d 247, 251 (W.D.N.Y. 2008).

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that BRS's motion to dismiss (Dkt. No. 12) is **DENIED**; and it is further

**ORDERED** that BRS file the appropriate responsive pleadings within the time allotted by the rules; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 29, 2014
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court